**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| MEGHAN CHERRY, KIMEN TROCHALAKIS, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| REALPAGE, INC.; GREYSTAR REAL ESTATE PARTNERS, LLC; TRAMMELL CROW COMPANY, LLC; LINCOLN PROPERTY CO.; FPI MANAGEMENT, INC.; AVENUE5 RESIDENTIAL, LLC; EQUITY RESIDENTIAL; ESSEX PROPERTY TRUST, INC.; THRIVE COMMUNITIES MANAGEMENT, LLC; AVALONBAY COMMUNITIES INC.; and SECURITY PROPERTIES INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**TABLE OF CONTENTS**

**Page**

I. NATURE OF THE ACTION ..................................................................1

II. PARTIES AND UNNAMED CO-CONSPIRATORS .......................................5

III. JURISDICTION AND VENUE ..............................................................8

IV. FACTUAL BACKGROUND ..................................................................8

    A. The Seattle Multifamily Submarket Responds to Supply and Demand Fundamentals in the Normal Course...................................8

    B. Before RealPage, Lessors Set Prices Independently...............................13

    C. The Lessor Defendants Eliminate Competition by Outsourcing Price and Supply Decisions to a Common Decision Maker, RealPage .........................14

    D. The Lessor Defendants and RealPage Have Inflated Prices, Reduced Occupancy (i.e., Output), and Distorted the Market for Residential Real Estate Leases....................................16

    E. "Plus Factors" Indicate the Market for Multifamily Residential Real Estate Leases in Seattle is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel ....................................18

V. CLASS ACTION ALLEGATIONS ..........................................................23

VI. CAUSE OF ACTION  VIOLATION OF THE SHERMAN ACT ....................25

FIRST CLAIM FOR RELIEF  VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR AGREEMENT IN RESTRAINT OF TRADE  15 U.S.C. § 1 (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF AND COMPENSATORY DAMAGES) ....................................25

SECOND CLAIM FOR RELIEF  VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION 15 U.S.C. § 1 (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF AND DAMAGES)....................26

REQUEST FOR RELIEF ..........................................................................28

JURY TRIAL DEMANDED ......................................................................29

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class consisting of all persons who leased multifamily residential real estate units directly from a defendant or co-conspirator beginning at least as early as January 1, 2016, through the present, in and around the Seattle downtown submarket for multifamily housing (hereinafter "the Seattle multifamily submarket").[1] Plaintiffs bring this action for treble damages and injunctive relief under Section 1 of the Sherman Act. Plaintiffs demand a trial by jury.

## I.     NATURE OF THE ACTION

1.      Plaintiffs Cherry and Trochalakis challenge an unlawful agreement among lessors of multifamily residential real estate leases ("Lessors") to artificially inflate the prices of multifamily residential real estate in and around downtown Seattle, Washington, above competitive levels.

2.      In the normal course, Lessors in the city center of Seattle priced their leases independently based on their own assessment of how best to compete with other lessors. In accordance with supply and demand fundamentals, Lessors operating in a competitive market will often lower their prices to attract renters from their competitors and maximize occupancy of their properties. Prior to the onset of the conspiracy at issue, this came in the form of rental concessions (e.g., "first month free").

3.      In approximately 2016,[2] more and more Lessors replaced their independent pricing and supply decisions with collusion by adopting a common revenue management program—thus artificially manipulating the forces of supply and demand to their favor. Lessors agreed to use a common third party that collected real-time pricing and supply levels, and then received forward-looking, unit-specific pricing and supply recommendations from that third party, based on a

---

[1] For purposes of this complaint, this includes leases for addresses with more than 10 listed apartments, within the Seattle neighborhoods Downtown Seattle, Capitol Hill/Central District, and South Lake Union/Queen Anne (defined here by zip codes 98122, 98109, 98104, 98102, 98121, 98101, 98119, 98112, 98199, 98107, 98117, and 98103). This region captures 45% of the population of Seattle, or around 330,000 residents. This will be described hereinafter as the "Seattle multifamily submarket."

[2] Use of the software approached 'critical mass' sometime around 2016 according to a trade group publication, What's Revving Revenue Management?, NAT'L APARTMENT ASS'N (Sept. 2016), https://www.documentcloud.org/documents/23131072-screencapture-naahq-org-news-publications-units-september-2016-article-whats-revving-revenue-management-2021-05-20-11_07_45?responsive=1&title=1 (last visited Nov. 10, 2022).

CLASS ACTION COMPLAINT - 1
Case No. Case 3:23-cv-00332    Document 1    Filed 11/11/22    Page 3 of 32 ID #: 3
011127-11/2071912 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

common algorithm using shared data. Lessors also agreed to follow these recommendations, on the expectation that competing Lessors would do the same.

4. RealPage, Inc. ("RealPage") provided the platform and the algorithm for collusion through a software called YieldStar, which granted Lessors the unprecedented ability to "track your competition's rent with precision."[3] Lessors submitted to RealPage data that is "as fine and granular as bits of sand,"[4] including rents charged *for each unit and each floor plan*, lease terms, amenities, move-in and move-out dates. RealPage takes this data—"literally hundreds of variables," according to founder and former CEO Steve Winn[5]—and recommends a price for each unit that a Lessor manages, giving the Lessor the courage to charge an inflated price by the implicit assurance that all of their competitors were doing the same. Such granular data on competitors was not publicly available to anyone but co-conspirators, as acknowledged by Winn. Winn noted in an earnings call, "We can look at the rents recorded in signed new leases tracked in either our property management or revenue management software. Those numbers give a much more accurate view of what's happening in the market compared to merely looking at rents reported by Internet listing services or other sources."[6] Together, RealPage and Lessors have successfully driven rents higher for renters in the central neighborhoods of Seattle, including Downtown Seattle, Capitol Hill/Central District, and South Lake Union/Queen Anne. Based on publicly available data, both average and median advertised rents for Defendant properties are consistently higher in the Seattle area than that of non-Defendant properties:

---

[3] https://www.realpage.com/videos/revenue-management-software-oveview-sop/ (video) (last visited Nov. 10, 2022).

[4] https://www.realpage.com/videos/yieldstar-helps-top-nmhc-companies/ (last visited Nov. 10, 2022).

[5] 2020 Q2 Earnings Call Transcript.

[6] 2020 Q2 Earnings Call Transcript.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594



5. RealPage reported that "[o]ver the past five years, annual rent growth in Seattle-Bellevue-Everett, WA averaged 3.25%." The top 20% of properties saw YoY revenue increase as much as 18.1%.[7] Elsewhere, RealPage described its services as "[n]ext-generation apartment pricing software that can drive up to 400% year-one ROI."[8] RealPage has even achieved outperformance in market downturns such as the recession in 2008 and the COVID-19 pandemic, as discussed below.

6. In combination with their usage of RealPage, Defendants regularly collected pricing information from each other. Confidential Witness 1 ("CW1"), a former employee at a Greystar building in downtown Seattle, stated that he would receive prices generated by RealPage on a daily basis. CW1 would also call, on a regular basis, competitor properties to directly obtain pricing information from them, such as an apartment building owned by Equity, a Greystar competitor.

---

[7] https://www.realpage.com/explore/main/wa/seattle-bellevue-everett (last visited Nov. 10, 2022).

[8] https://web.archive.org/web/20220923051511/https://www.realpage.com/asset-optimization/revenue-management/ (last visited Nov. 10, 2022).

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

7. CW1 stated, "You'd call up the competition in the area. Sometimes there'd be a list of 10 people to call. Sometimes just one. You'd ask what they are charging for their apartments. Then you'd literally change the prices right there on RealPage. Manually bump it up." CW1 further stated, "It was price-fixing . . . what else can you call it when you're literally calling your competition and changing your rate based on what they say?"

8. Employees at Greystar in Seattle would regularly perform market surveys where they would call competitors to get rental pricing for comparable apartments. Employees would then submit the pricing survey information to their managers.

9. Confidential Witness 2 ("CW2"), a former employee at Greystar in Seattle, would also regularly call competitors to obtain detailed information regarding their pricing, including rental pricing, number of tours, amenities, and any specials that the competitors were offering. In particular, CW2 had direct communications with employees of AVA Capitol Hill, an apartment building that appears to be affiliated with Defendant Avalon Bay. CW2 stated that the calls would happen two to three times a day, with somebody calling to get information. CW2 stated, "If somebody called me looking for numbers, I'd tell them and then turn around and say 'now it's your turn. What are your numbers?'" CW2 would provide the pricing information obtained to CW2's manager. CW2 understood that regional managers were responsible for setting the pricing for the apartment buildings.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

10. Based on publicly available data, Plaintiffs performed a regression analysis to estimate advertised rent price based on the size of the property and the number of bedrooms, and an indicator as to whether the property was listed by a defendant or non-defendant. The anticompetitive effects of Defendants' conduct are seen in the fact that actual prices for Defendants' listings were consistently higher, across all types of apartments and controlling for income, than the but for prices, based on the non-Defendant listings within the central Seattle area.



11. The conspiracy Plaintiffs challenge is unlawful under Section 1 of the Sherman Act. Plaintiffs bring this action to recover their damages, trebled, as well as injunctive and other appropriate relief, detailed *infra*, on behalf of all others similarly situated.

## II. PARTIES AND UNNAMED CO-CONSPIRATORS

12. Plaintiff Meghan Cherry (formerly known as Christopher Berg) is a citizen and resident of the State of Washington. Ms. Cherry rented multifamily residential units in properties managed by Lessor Defendant Essex and Lessor Defendant Greystar in and around downtown Seattle, Washington, beginning in 2020 through July 2022. Ms. Cherry has paid higher rental prices by reason of the violations alleged herein.

CLASS ACTION COMPLAINT - 5
Case No.
011127-11/2071912 V1

Case 3:23-cv-00332    Document 1    Filed 11/11/22    Page 7 of 32 PageID #: 7

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

13. Plaintiff Kimen Trochalakis is a citizen and resident of the State of Washington. Ms. Trochalakis rented a multifamily residential unit in a property managed by Lessor Defendant Avenue5 in and around downtown Seattle, Washington, beginning in 2021 through the present. Ms. Trochalakis has paid higher rental prices by reason of the violations alleged herein.

14. Defendant RealPage, Inc. is a Delaware corporation headquartered in Richardson, Texas. RealPage provides software and services to the residential real estate industry, including the revenue management software described herein.

15. Lessor Defendant Greystar Real Estate Partners, LLC ("Greystar") is a Delaware limited liability corporation headquartered in Charleston, South Carolina. It is the largest manager of multifamily rental real estate in the United States,[9] and rents properties in and around downtown Seattle, Washington. Greystar is one of RealPage's clients and uses its revenue management software.

16. Lessor Defendant Trammell Crow Company, LLC ("Trammell Crow") is a Delaware limited liability corporation headquartered in Dallas, Texas. Trammell Crow rents properties in and around downtown Seattle, Washington. Trammell Crow is one of RealPage's clients and uses its revenue management software.

17. Lessor Defendant Lincoln Property Co. ("Lincoln") is a Texas corporation headquartered in Dallas, Texas. Lincoln is the second largest manager of multifamily rental real estate in the United States, with over 210,000 multifamily units under management nationally. Lincoln rents properties in and around downtown Seattle, Washington. Lincoln is one of RealPage's clients and uses its revenue management software.

18. Lessor Defendant FPI Management, Inc. ("FPI") is a California corporation headquartered in Folsom, California. FPI is the fifth largest manager of multifamily rental real estate in the United States, with over 150,000 multifamily units under management in 17 states. FPI rents properties in and around downtown Seattle, Washington. FPI is one of RealPage's clients and uses its revenue management software.

---

[9] https://editions.mydigitalpublication.com/publication/?m=58489&i=733087&p=92&ver=html5 (last visited Nov. 10, 2022).

19.     Lessor Defendant Avenue5 Residential, LLC ("Avenue5") is a Delaware limited liability company headquartered in Seattle, Washington. Avenue5 is the twelfth largest manager of multifamily rental real estate in the United States, with over 96,900 multifamily units under management in 12 states. Avenue5 rents properties in and around downtown Seattle, Washington. Avenue5 is one of RealPage's clients and uses its revenue management software.

20.     Lessor Defendant Equity Residential ("Equity") is a Maryland real estate investment trust headquartered in Chicago, Illinois. Equity is the sixteenth largest manager of multifamily rental real estate in the United States, with over 80,000 units under management in eight states. Equity rents properties in and around downtown Seattle, Washington. Equity is one of RealPage's clients and uses its revenue management software.

21.     Lessor Defendant Essex Property Trust, Inc. ("Essex") is a Maryland corporation headquartered in San Mateo, California. Essex rents properties in and around downtown Seattle, Washington. Essex is one of RealPage's clients and uses its revenue management software.

22.     Lessor Defendant Thrive Communities Management, LLC ("Thrive") is a Washington Limited Liability Company headquartered in Seattle, Washington. Thrive has over 18,000 units under management in the greater Pacific Northwest. Thrive rents properties in and around downtown Seattle, Washington. Thrive is one of RealPage's clients and uses its revenue management software.

23.     Lessor Defendant Avalonbay Communities Inc. ("Avalonbay") is a Maryland corporation headquartered in Lutherville Timonium, Maryland. Avalonbay rents properties in and around downtown Seattle, Washington. Avalonbay is one of RealPage's clients and uses its revenue management software.

24.     Lessor Defendant Security Properties Inc. ("Security Properties") is a Washington corporation headquartered in Seattle, Washington. Security Properties has over 22,000 units under management in eighteen states. Security Properties rents properties in and around downtown Seattle, Washington. Security Properties is one of RealPage's clients and uses its revenue management software.

CLASS ACTION COMPLAINT - 7
Case No.
011127-11/2071912 V1
Case 3:23-cv-00332    Document 1    Filed 11/11/22    Page 9 of 32    PageID #: 9
HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

### III. JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

26. This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and Washington's long-arm statute, the Revised Code of Washington § 4.28.185.

27. Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the sale of multifamily residential real estate leases.

28. Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of multifamily residential real estate leases.

29. Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

### IV. FACTUAL BACKGROUND

**A. The Seattle Multifamily Submarket Responds to Supply and Demand Fundamentals in the Normal Course**

30. The relevant product market is the market for the lease of multifamily residential real estate and the relevant geographic market is in and around downtown Seattle, Washington. Specifically, this includes the neighborhoods of Downtown Seattle, Capitol Hill/Central District, and South Lake Union/Queen Anne.[10] This market is referred to as the Seattle multifamily submarket.

31. Multifamily real estate leases in downtown Seattle neighborhoods comprise a distinct product and geographic submarket. Residents who move to the urban center of Seattle

---

[10] Upon information and belief, the geographic market comprises the zip codes 98122, 98109, 98104, 98102, 98121, 98101, 98119, 98112, 98199, 98107, 98117, and 98103.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

know that the attractions of the neighborhood—such as restaurants, museums, and shops—are as much a part of their living experience as anything mentioned in a rental lease. A two-bedroom apartment in downtown Seattle may compete with an apartment on the next street over for renters, but would not realistically compete with a similar unit for rent in Tacoma—even if it had the same number of bathrooms and bedrooms, the same square footage, and even the same price. RealPage itself recognizes and conducts market analysis based on such submarkets. In its Explore page, RealPage separates the city of Seattle into multiple submarkets, including specifically Downtown Seattle, Capitol Hill/Central District, and South Lake Union/Queen Anne.[11]



32.     On its website, RealPage lists the properties that it covers in the relevant neighborhoods:

---

[11] https://www.realpage.com/explore/main (last visited Nov. 10, 2022).

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

33.    In Downtown Seattle:



34.    In Capitol Hill/Central District:



HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

35. In South Lake Union/Queen Anne:

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

36.     Taken altogether, properties using RealPage have a significant presence in the Seattle multifamily submarket. ProPublica also independently found that large apartment buildings between the Space Needle and Pike Place Market "are overwhelmingly controlled by RealPage clients."[12]



37.     Therefore, the geographic market is in and around downtown Seattle, Washington.

38.     Consumers do not consider apartments, condominiums, or houses for purchase as substitutes for multifamily rental apartment units because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing. Nor is single-family real estate considered an economic substitute for multifamily residential real estate. For example, single-family properties typically do not offer amenities and security.

39.     The Seattle multifamily submarket satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant

---

[12] ProPublica, October 15, 2022, Rent Going Up? One Company's Algorithm Could Be Why (https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent) (hereinafter "ProPublica article") (last visited Nov. 10, 2022).

CLASS ACTION COMPLAINT - 12
Case No.
011127-11/2071912 V1

Case 3:23-cv-00332   Document 1   Filed 11/11/22   Page ID #: 14

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

40.    Here, the SSNIP test is satisfied and the market is properly defined. As described above and below, pursuant to the Lessors' agreement not to compete on price, Lessors are able to increase "year over year, between 5% and 12% in every market," including Seattle, yet those increases have not driven enough renters out of the Seattle rental market such that the SSNIP has become unprofitable to Lessors. Specifically in the Seattle market, the top 20% of properties saw an 18.1% YoY increase in revenue, and in the past five years, annual rent growth in the broader Seattle-Bellevue-Everett area averaged 3.25%.[13]

41.    According to public listings data, listings by Defendant Lessors had statistically significant higher rents than listings by non-defendants after controlling for number of bedrooms and square footage.

**B.    Before RealPage, Lessors Set Prices Independently**

42.    Before RealPage facilitated collusion among Lessors, Lessors acting independently tried to maximize occupancy. Every day a unit was left empty was a lost opportunity to earn revenue for that day, so Lessors offered sufficiently attractive pricing to maintain maximum occupancy. This often came in the form of reduced prices or promotional offers, such as rental concessions (offering the first month free if the customers signed a one-year lease).

43.    RealPage has acknowledged this market dynamic, stating, "When markets soften, the focus naturally turns from rent growth to maintaining occupancy, which often leads to concessions for new leases and at the sacrifice of rent growth on renewals. Softening markets –

---

[13] https://www.realpage.com/explore/main/wa/seattle-bellevue-everett (last visited Nov. 10, 2022).

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

some created by new supply coming on line, others by changing demand levels – have led to discounted rents in some major metros."[14]

44.    Lessors maximized occupancy by setting their own prices based on their independent observations of the market. This type of pricing strategy is characteristic of a competitive market.

**C.    The Lessor Defendants Eliminate Competition by Outsourcing Price and Supply Decisions to a Common Decision Maker, RealPage**

45.    Instead of offering concessions and discounts to entice customers as Lessors did in the normal course, RealPage enabled Lessors to set and keep rents artificially high and defy fundamental supply and demand dynamics. Following widespread adoption of RealPage's YieldStar revenue management software, Lessors swiftly shifted from the previous competitive status quo to a new strategy, facilitated by RealPage: increasing prices notwithstanding market conditions and tolerating the lost revenue resulting from any unrented and empty housing units. In a competitive market, this strategy would quickly fail—any units listed at prices exceeding the market price would be undercut by competitors and thus stay empty, and that lessor would eventually go out of business.

46.    RealPage and participating Lessors have effectuated their anticompetitive agreement to hike prices by agreeing generally to set prices using RealPage's coordinated algorithmic pricing. Participating Lessors also agreed to provide RealPage with real-time access to their competitively sensitive and nonpublic data on their housing real estate leases. In the market RealPage and Lessors created, each Lessor had mutual assurances that other Lessors would also keep prices high, leaving renters with no choice but to pay what Lessors demanded. RealPage helped lessors overcome their "lack of faith in the property's ability to command the rental rates generated."[15]

---

[14] https://www.realpage.com/blog/revenue-management-proven-market-cycle-ebook/ (last visited Nov. 10, 2022).

[15] *Gearing Up for the Apartment Revenue Management Conference*, August 2013, National Apartment Association, https://www.naahq.org/sites/default/files/naa-documents/publications-units/august-units-13/Gearing-For-Apartment-Revenue-Management-Conference-Units-Aug2013.pdf (last visited Nov. 10, 2022).

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

47.     RealPage's system and YieldStar algorithm granted Lessors pricing courage, or pricing discipline. This is reflected in RealPage's own marketing materials. Andrew Bowen, RealPage's Vice President of Investor Markets, said the algorithm is "driving" the growth, because "[a]s a property manager, very few of us would be willing to actually raise rents double digits within a single month by doing it manually."[16] During an earnings call in 2017, founder and former CEO Steve Winn said one large property company, which managed more than 40,000 units, learned it could make more profit by operating at a lower occupancy level that "would have made management uncomfortable before."[17] More bluntly, the creator of RealPage's revenue management software Jeffrey Roper stated that the software circumvented agents who had "way too much empathy" and hesitated to push rents higher.[18]

48.     Customer testimonials on RealPage's website tout their newfound pricing courage. "The beauty of YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it," said Kortney Balas, director of revenue management at JVM Realty.[19] America Melragon, VP of Revenue Management for IRT, stated in a video testimonial: "We've actually noticed that already that in the majority of our markets . . . competitors that do not use a sophisticated revenue management tool, competitors that are manually pricing have already started to experience pretty significant swings in their effective price, pretty significant swings in their overall concessions. For us, really having that insight into our own individual supply and demand exposure has helped our price pretty much stay in line with where we anticipate it to be."[20]

49.     On information and belief, RealPage regularly provides participating Lessors with recommended price levels through their revenue management algorithms, which Lessors accept more than 80% of the time.[21] RealPage regularly meets and communicates with Lessors regarding their pricing strategies.

---

[16] ProPublica article.

[17] ProPublica article.

[18] ProPublica article.

[19] ProPublica article.

[20] https://www.realpage.com/videos/irt-gains-pricing-stability/ (video) (last visited Nov. 10, 2022).

[21] ProPublica article.

HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

50. RealPage strongly emphasizes the importance of participating Lessors to focus on maximizing profitability and total revenue, rather than the procompetitive focus on occupancy rates that would occur in a competitive market, and did occur among lessors before the rise of revenue management programs. Jeffrey Roper, RealPage's main architect, publicly described the problem: "If you have idiots undervaluing, it costs the whole system."

**D. The Lessor Defendants and RealPage Have Inflated Prices, Reduced Occupancy (i.e., Output), and Distorted the Market for Residential Real Estate Leases**

51. Trusting that their co-conspirators would not undercut them, Lessors kept rents high and tolerated the lost revenue resulting from any unrented and empty housing units—and rents were raised so high that revenues dwarfed any losses from unrented units. RealPage has recommended that Lessors accept a lower occupancy rate in order to raise rents and ultimately make more money. Founder and former CEO Steve Winn stated that one lessor had been seeking occupancy levels of 97% or 98% in markets where it was a leader, but upon implementing YieldStar, managers saw that raising rents and leaving some apartments vacant made more money.[22] Winn stated, "Initially, it was very hard for executives to accept that they could operate at 94% or 96% and achieve a higher NOI by increasing rents," but RealPage permitted them to "operate at 95%, while seeing revenue increases of 3% to 4%."[23]

52. RealPage's Market Leaderboard on the Seattle-Bellevue-Everett market states that as of 2022, the market recorded occupancy of 95.13%, "below the U.S. average," and had "declined -1.67 points year-over-year." At the same time, "Over the past five years, annual rent growth in Seattle-Bellevue-Everett, WA averaged 3.25%." The top 20% of properties saw 18.1% increase in YoY revenue.[24]

53. ProPublica analyzed the country's top 10 property managers as of 2020 and found that in metro areas of Seattle, rents for a typical two-bedroom apartment rose 30% or more between 2014 and 2019.[25] One report found that Seattle had the steepest rent growth of any major city in

---

[22] ProPublica article.

[23] ProPublica article.

[24] https://www.realpage.com/explore/main/wa/seattle-bellevue-everett (last visited Nov. 10, 2022).

[25] ProPublica article.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

the nation in the decade between 2009 and 2019.[26] Others have been priced out of Seattle altogether.

54.     One lessor, Camden, had turnover rates increase by about 15 percentage points in 2006 after it implemented YieldStar. But revenue grew by 7.4%. According to one representative, "The net effect of driving revenue and pushing people out was $10 million in income . . . I think that shows keeping the heads in the beds above all else is not always the best strategy."[27]

55.     RealPage's pricing software was built by individuals who previously had been involved in anticompetitive, coordinated pricing efforts. Jeffrey Roper, one of the main architects of RealPage's software, was the former Director of Revenue Management at Alaska Airlines when it and other airlines began using common software to share nonpublic planned routes and prices with each other in the 1980s. The Department of Justice estimated that the agreement cost customers over a billion dollars, and reached settlements or consent decrees for price-fixing violations with eight airlines, including Alaska Airlines. Roper said, "We all got called up before the Department of Justice in the early 1980s because we were colluding . . . . We had no idea." But Roper evidently did not learn his lesson: less than a decade later, he had turned to the apartment rental industry to begin building a "master data warehouse" of client data.[28]

56.     RealPage also enabled Lessors to defy market forces like market downturns, advertising, "There is always money to be made regardless of market conditions."[29] Lessor Defendants Greystar and Trammell Crow were lauded as success stories in downturns who had outperformed the market by 4.8% and boosted revenue by 3%, respectively.[30]

---

[26] https://www.kiro7.com/news/local/report-shows-seattle-area-has-largest-rent-increase-nation-over-past-decade/3C4CAHGUYZFLZOOI4MRDZRG6UY/ (cited in ProPublica article) (last visited Nov. 10, 2022).

[27] ProPublica article.

[28] ProPublica article.

[29] https://www.realpage.com/ebooks/outperform-in-a-down-market/?utm_source=pmi&utm_medium=bp&utm_campaign=content-aso19163-revenue-management-in-a-downturn&utm_term=blog&utm_content=20190417-proven&showPdf=true (last visited Nov. 10, 2022).

[30] https://www.realpage.com/ebooks/outperform-in-a-down-market/?utm_source=pmi&utm_medium=bp&utm_campaign=content-aso19163-revenue-management-in-a-downturn&utm_term=blog&utm_content=20190417-proven&showPdf=true (last visited Nov. 10, 2022).

CLASS ACTION COMPLAINT - 17
Case 3:23-cv-00332    Document 1    Filed 11/11/22    Page 19 of 32  Page ID #: 19
011127-11/2071912 V1

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

57. Similarly, during the first months of the COVID-19 pandemic in 2020, RealPage urged property managers to let "science trump emotion"[31] and keep rents high, contrary to market forces. Winn anticipated in 2020 that supply of units was going to increase, stating, "new supply is expected to continue to pour into the market in 2021 . . . . Scheduled completions top the demand volume that RealPage [economists] anticipate over the next few months. We're expecting that U.S. apartment occupancy will trail off another 100 basis points or so through early 2021, dipping to around 94%. [Likewise,] we're forecasting that rents will begin to drop again once we hit the seasonally slow leasing period that comes in the cold winter months."[32] But Winn later assured investors that even in a down market, RealPage had found a way to keep outperforming, even through economic downturns.[33] Indeed, by Q3 2020, RealPage reported "the best quarter in our company's history, growing quarterly revenue 17% to $299 million and adjusted EBITDA, 19% to just over $86 million. This is well above our guidance, in large part due to the good execution by our teammates as well as the industry's agility in dealing with the pandemic."[34]

E. **"Plus Factors" Indicate the Market for Multifamily Residential Real Estate Leases in Seattle is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel**

58. The Seattle multifamily submarket for the sale of multifamily residential real estate leases from Lessors to lessees is characterized by numerous "plus factors" that render the industry susceptible to collusion such that the formation, maintenance, and efficacy of a cartel is more likely. These include (1) high barriers to entry, (2) high barriers to exit, (3) market concentration, (4) inelastic consumer demand, (5) relative fungibility of residential real estate leases, (6) exchanges of competitively sensitive information among horizontal competitors, and (7) numerous opportunities to collude at trade associations and RealPage functions.

59. First, property owners and operators face significant entry barriers. These include the high cost of acquiring property, establishing a property management infrastructure, and ongoing costs of building maintenance and regulatory compliance. Even small rental properties

---

[31] 2020 Q1 Earnings Call Transcript.
[32] 2020 Q2 Earnings Call Transcript.
[33] 2020 Q2 Earnings Call Transcript.
[34] 2020 Q3 Earnings Call Transcript.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

cost millions of dollars to acquire. Large properties, such as those operated by Greystar, run into the hundreds of millions of dollars to own and manage, and take several years and significant experience to build or acquire. Thus, new entrants into the multifamily real estate leasing market are unlikely to discipline cartel pricing.

60. Second, renters face high exit barriers. Renters typically incur substantial costs and inconvenience when moving. As such, renters cannot easily turn to alternative lessors to discipline cartel pricing.

61. Third, the demand for multifamily housing real estate property leases is relatively inelastic. Except for an anomalous period during the height of the COVID-19 pandemic, renters needed to live near their offices, schools, and communities. For a Seattle resident, there were few realistic and low-cost alternatives to renting from a Lessor Defendant, who dominated the relevant market during the class period. Thus, no reasonable substitutes exist to discipline cartel pricing.

62. Fourth, the Seattle multifamily submarket is highly concentrated. In the neighborhoods and zip codes identified (Downtown Seattle, Capitol Hill/Central District, and South Lake Union/Queen Anne), Lessor Defendants managed 60% of all properties. In the greater Seattle area, Lessor Defendants managed 57% of all properties.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Share of Multi-family Listings

63. James Nelson, a former bank examiner and loan broker, is writing a book on the topic of concentration of landlords, telling ProPublica, "There is no competition." This reflects a national trend: the number of apartments controlled by the country's 50 largest property managers has grown every year for 14 years, according to the National Multifamily Housing Council.[35]

64. Fifth, multifamily housing residential real estate properties are relatively fungible, particularly within classes of properties. That is, when controlling for certain high-level characteristics of properties—such as the number of bedrooms and bathrooms, amenities, location, or the age of the building—properties within those classes are relatively fungible.

65. Sixth, RealPage's participating Lessors, directly and using RealPage as a conduit, share competitively sensitive information with one another. Founder and former CEO Steve Winn has noted in earnings calls that RealPage's numbers "give a much more accurate view of what's happening in the market compared to merely looking at rents reported by Internet listing services

[35] ProPublica article.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

or other sources."[36] It is even less likely that this function could be recreated using any public, non-competitively sensitive sources as the advertised rates for multifamily real estate leases can diverge from the actual rates. Furthermore, RealPage provides specific, non-public pricing information on important factors such as concessions that are given at the time of lease that are individually negotiated and not otherwise publicly available.

66. Seventh, RealPage and participating Lessors have ample opportunities to collude.

67. RealPage operates a private RealPage User Group Forum, an association of over a thousand participating Lessors, which, according to RealPage, aims "to improve communications between RealPage and the user community," while "promot[ing] communication between users" themselves. Within that Forum is an "Idea Exchange," where Lessors submit their own recommendations for changes or improvements to RealPage's offerings, as well as provide comments on proposed changes that RealPage is considering implementing to its software offerings.[37]

68. RealPage also encourages clients to serve on subcommittees, which requires that client "[a]ttend one annual meeting to be held during the RealWorld conference" and "[p]articipate in one conference call per quarter."[38]

69. RealPage has hosted in-person, annual, multi-day RealWorld summits. The summits gather Lessors with RealPage executives to network, exchange insights and ideas, and discuss revenue management tools. Over the past five years, those conferences have been held in Las Vegas, NV, Nashville, TN, Orlando, FL, and virtually during the COVID-19 pandemic.

70. Industry trade associations offer RealPage and participating Lessors additional opportunities to conspire. As an illustrative example, the National Multifamily Housing Council ("NMHC"), which advertises itself as "the place where the leaders of the apartment industry come together to guide their future success," holds several events every year, including in person

---

[36] 2020 Q2 Earnings Call Transcript.

[37] https://web.archive.org/web/20220128195118/https://www.realpage.com/user-group/overview/ (last visited Nov. 10, 2022).

[38] https://web.archive.org/web/20220128185904/https://www.realpage.com/user-group/membership/ (last visited Nov. 10, 2022).

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

"Apartment Strategy Conference," an "Annual Meeting," a "Fall Meeting," hosted in cities including San Diego, CA, Las Vegas, NV, and Washington, DC. NMHC counts among its "Chair's Circle Sponsors" RealPage, Greystar, and more participating Lessors. Of note, NMHC "tracks market conditions through NMHC member surveys as well as data from data provider partners," to provide "industry benchmarks" on topics including "In Place Rent Per Square Foot," "Rent Change – New Leases," and "Rent Change – Renewals." RealPage has also attended Pension and Real Estate Association, Urban Land Institute, and National Apartment Association ("NAA") conferences.

71. Finally, RealPage advisors have regular contact with Lessors to keep them up to date on their competitors. Advisors help Lessors "Review pricing daily or weekly in collaboration with on-site and regional operations management," "Monitor and report on weekly rents, occupancy and revenue trends," and "Adjust configurations and pricing to align with your asset objectives as market conditions and business strategies change."[39] In an earnings call, CFO Tom Ernst stated that they were "actively ramping" efforts to have RealPage's sales team discuss their revenue management products with their clients.[40]

**F.  Fraudulent Concealment**

72. Defendants actively concealed their conduct, including the extent of their information exchange. Plaintiffs and members of the Class did not discover, and could not have discovered, Defendants' anticompetitive conduct.

73. Plaintiffs and members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in anticompetitive conduct, including secret information exchange and other communications, that did not reveal facts that would put Plaintiffs or members of the Class on inquiry notice that there

---

[39] https://web.archive.org/web/20220923051511/https://www.realpage.com/asset-optimization/revenue-management/ (last visited Nov. 10, 2022).

[40] 2020 Q2 Earnings Call Transcript.


HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

was an anticompetitive agreement related to the submarket for multifamily housing in Seattle. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and class members.

74. Not until recently was the conduct of Defendants, including the actions of RealPage, widely known or reported. Only after the recent publication in October 2022 of an article in ProPublica was there a comprehensive presentation of the full scope of the confidential services that RealPage provides to its clients in the real estate industry.

75. Defendants concealed their relationships with RealPage. Indeed, to this day, it is not publicly known the number of companies that participate in or contribute data to RealPage's Yieldstar algorithm. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' prices on leases in the Seattle area.

## V. CLASS ACTION ALLEGATIONS

76. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

77. All persons in the identified neighborhoods and zip codes of Seattle, Washington, that are direct purchasers of multifamily residential real estate leases from a Lessor participating in RealPage's pricing software, or from a division, subsidiary, predecessor, agent, or affiliate of such Lessor, at any time during the period of January 1, 2016, until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.[41]

78. The Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands if not hundreds of thousands of members in the proposed Class.

79. Plaintiffs' claims are typical of those of the Class.

---

[41] Federal and state government entities are excluded from the Class.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

80.     Plaintiffs and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more for multifamily residential leases than they otherwise would have in a competitive market.

81.     Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are not antagonistic to the Class.

82.     Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual class members, since the Defendants have acted and refused to act on grounds generally applicable to the Class.

83.     Questions of law and fact common to the Class include:

    a.     Whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate price and/or artificially suppress supply of multifamily residential real estate leases from competitive levels;

    b.     If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates Section 1 of the Sherman Act under the *per se*, quick look, or rule of reason modes of analysis;

    c.     If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply of multifamily residential real estate leases from competitive levels;

    d.     The proper measure of damages; and

    e.     The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

84.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

85.     Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without

011127-11/2071912 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## VI.     CAUSE OF ACTION

### VIOLATION OF THE SHERMAN ACT

### FIRST CLAIM FOR RELIEF

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### FOR AGREEMENT IN RESTRAINT OF TRADE
### 15 U.S.C. § 1
### (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND
### EQUITABLE RELIEF AND COMPENSATORY DAMAGES)

86.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

87.     Beginning at a time currently unknown to Plaintiffs and members of the Class, Defendants and their co-conspirators formed a cartel to artificially inflate the price of and artificially decrease the supply and output of housing leases in the Seattle multifamily submarket.

88.     Defendants' cartel has caused Plaintiffs and members of the Class to suffer overcharge damages.

89.     There are no procompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

90.     The Defendants' cartel is unlawful under a *per se* mode of analysis. In the alternative, the Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT
FOR CONSPIRACY TO EXCHANGE COMPETITIVE
INFORMATION 15 U.S.C. § 1
(ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND
EQUITABLE RELIEF AND DAMAGES)**

91.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

92.     Beginning at a time currently unknown to Plaintiffs, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

93.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

94.     Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for multifamily real estate leases in the Seattle multifamily submarket.

95.     The relevant product market is the market for the lease of multifamily real estate and the relevant geographic market is in and around downtown Seattle, Washington. Specifically, this includes the neighborhoods of Downtown Seattle, Capitol Hill/Central District, and South Lake Union/Queen Anne.

96.     Defendant integrators possess market power in the Relevant Market. Defendants controlled approximately 60 percent of the Relevant Market for the lease of multifamily real estate in the relevant geographic market. In the Belltown neighborhood in Seattle, 70% of apartments were overseen by just 10 property managers, every single one of which used pricing software sold by RealPage.[42]

---

[42] ProPublica article.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

97. Defendants could impose an increase in the price of leases collectively without causing many consumers to switch their purchases to another lease. Leases constitute a unique product market.

98. The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current supply, production, and pricing plans regarding leasing. The information exchanges specifically included the exchange through RealPage of prices that were lower.

99. Defendants' regular information exchanges through RealPage reflected concerted action between horizontal competitors in the market for leases.

100. Each defendant furnished competitively sensitive information to other leasing companies with the understanding that it would be reciprocated.

101. The agreement to regularly exchange detailed and non-public information about current production, supply, and pricing of leases suppressed competition between the Defendants. RealPage specifically identified for Defendants the instances where their pricing was lower than other Defendants and where they could raise their prices to match.

102. When Defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Defendants used the data obtained through RealPage to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the leasing market. This strategic information was a material factor in Defendants' decisions to inflate the prices that Plaintiffs paid for leases during the Class Period.

103. Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

104. The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendants in the Seattle multifamily submarket, and (2) inflating the prices of leases during the Class Period.

105.     As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for leases.

106.     As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for leases than they would have paid and will pay in the absence of the conspiracy.

107.     The alleged contract, combination, or conspiracy is also a *per se* violation of the federal antitrust laws.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

C.      Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that joint and several judgments in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws "permit";

D.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

F.      Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: November 11, 2022          Respectfully submitted,

By:      */s/ Steve W. Berman*
          Steve W. Berman, WSB# 12536
By:      */s/ Breanna Van Engelen*
          Breanna Van Engelen, WSB #49213
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Rio S. Pierce (*pro hac vice to be applied for*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
riop@hbsslaw.com

Hannah K. Song (*pro hac vice to be applied for*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
hannahso@hbsslaw.com

*Attorneys for Plaintiffs*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594